We're going to have him here today and tomorrow, and we look forward to spending time with him. So for today, I think you may have been previously advised, but just in case you were not, when you come to the microphone to speak, please do remove your mask and you can go ahead and present your argument without your mask. And when you're done, if you could please just reapply your masks. All righty. Our first case today is United States of America v. Jesse James Turner. And we will hear first from Mr. Hanley. May it please the Court, I'm Stuart Hanley and I represent the appellate in this case, Mr. Jesse Turner. I believe at the outset of argument, it may be beneficial to note that the briefings indicate that the parties seem, that there's several points that the parties seem not to dispute or that seemed not to be in serious contention on appeal. The parties seem to agree that Rule 704B expressly prohibits experts from giving their opinions at trial about whether a criminal defendant did or did not have a mental state or condition that constitutes the element of a defense. And further, seem to agree that Mr. Turner's ability to appreciate the nature and quality or wrongfulness of his acts is an element of his insanity defense. I also don't think that the government denies that their own expert psychologist, Dr. Barnett, recognized at trial that Mr. Turner was suffering from hallucinations, delusions and other symptoms consistent with psychosis in the days immediately surrounding his arrest. Nor do I believe they deny that she recognized psychosis as a severe mental disorder and that it was a mental disorder that can make the thoughts and emotions so impaired that an individual can lose contact with external reality, that this condition may leave someone affected by it unable to understand the nature of their surroundings, the nature of their actions and maybe even the consequences of their actions. She further recognized that psychosis can be brief, can come and go unusually quickly and can be very short term. That said, the parties do diverge on two particular issues. Number one is whether the trial court allowed Dr. Barnett to give opinion, testimony and violation of Rule 704B. And number two, if so, was that error harmless? Now, on the first issue, the record is frankly as clear as it can be. Dr. Barnett was allowed to first give a legal definition of insanity defense over defense counsel's objections. Then she was directly and repeatedly asked by the government whether in her professional opinion as a psychologist and expert in psychology, whether Mr. Turner was able to appreciate the nature and wrongfulness of his acts. And then she repeatedly confirmed her opinion that he was in fact able to do so. She was further allowed to go on and give specific instances and examples of why she believed that opinion was appropriate. Now, this testimony wasn't some sort of testimony that simply led the jury to some obvious conclusion, led them to an obvious inference. This testimony cut all the corners and plainly and directly told the jury that Dr. Barnett did not believe that Mr. Turner had the precise mental state that was necessary for his insanity defense to prevail. And this testimony just really couldn't be any more plainly in violation of Rule 704B. So that leads to the next question. Was this a harmless error? And the record shows that this error was not harmless and it could not and it very likely had a substantial influence on the outcome of the case as this opinion carried the weight of an expert credentials and it concerned the very central aspects of Mr. Turner's defense. This evidentiary error is not related to some peripheral or tangential issue in the case concerning some minor dispute of fact.  The opinion precisely addressed, again, whether Mr. Turner had the mental state necessary for his defense to prevail. Now, it's very important because Mr. Turner didn't dispute possessing firearms in this case. That was not the defense. Rather, he asked the jury to find him not guilty on sort of a blended defense of governmental immunity and insanity. And although this defense was necessarily multifaceted based on kind of the particular bizarre facts of the case, Mr. Turner's insanity defense was the linchpin of the strategy and a large amount of evidence at trial focused directly and was relevant directly on this defense. Dr. Barnett's testimony recognized that Mr. Turner's symptoms were consistent with a severe mental disorder, which necessarily leads to the overarching question of whether such a disorder would leave him unable to appreciate the nature and quality or wrongfulness of his acts. That was the key to the case at that point. Now, that's a question that Rule 704B reserves exclusively for the jury and explicitly for the jury. And there was abundant evidence, abundant throughout the record, from which the jury could find that Mr. Turner was, in fact, unable to appreciate the nature and quality or wrongfulness of his acts. What Dr. Barnett's testimony effectively did was usurp the jury's role in this regard and essentially directed them to reject Mr. Turner's defense based on her opinion on the ultimate issue. And that is despite the fact that the record is full of competent and uncontradicted evidence that Mr. Turner was suffering from a very significant and severe mental condition that altered his perceptions and appreciation of reality. And that came through the testimony of his actions combined with Dr. Barnett's testimony. Ultimately, Dr. Barnett's opinion on this issue violated Rule 704B and served to directly contradict and invalidate Mr. Turner's insanity defense. Because of this, and the record as a whole shows, based on the nature of the case, the nature of the defense and the testimony, that this opinion very well may have substantially affected the outcome in this case. Because of this, the court's abuse of discretion allowing the opinion testimony cannot be considered harmless and Mr. Turner's conviction should be overturned. Your Honors, I'd be more than happy to answer any questions by the court, but if not, I've reserved my remainder for my rebuttal. Thank you, counsel. Thank you. Mr. McDonald. Good morning, and may it please the court. My name is Oliver McDonald with the United States. The jury in this case heard one piece of evidence which we agree was improperly admitted. That piece of evidence was relevant only to Mr. Turner's affirmative defense of insanity, under which he had to prove by clear and convincing evidence that he did not understand the nature of his actions. The weight of the evidence before the jury on that issue overwhelmingly disproved that affirmative defense. Mr. McDonald was the prosecutor who handled this case, the trial attorney. The president at the motion in Lemony hearing on this subject? I don't specifically recall, but I believe it's our office's practice that it would have been the case. Yeah, she would have been there? Yes, Your Honor. Well, then she would have known better than to ask the question. Do you agree with that? Your Honor, I think... Not only the rule, but let me ask you, did the trial judge make a ruling at the hearing in Lemony? The trial judge... That the witness was not to be asked that question? The trial judge reserved judgment on defense counsel's motion in Lemony. Okay, so that was clear? Yes, Your Honor. Okay. What would have possessed her to ask that question? Your Honor, I can't speak to the prosecutor's state of mind, but I can say that there was a lot going on in this trial. And I also believe it was the prosecutor's first criminal jury trial. And so I offer that as an explanation. The reason I ask is it seems to me that the United States attorney needs to convene some educational sessions with the lawyers who are trying these cases. Your Honor, I agree that the questions... One of the problems that we run into when you have somebody who did not try the case, is not making the argument now. If she were standing here, she'd have to answer all these questions. It'd be a little embarrassing, and you learn a lot of lessons that way. I think so. And the briefing speaks to those lessons, Your Honor. I would agree that the questions are inartful, but also believe that the court's focus on harmless error should be on the evidence actually before the jury. And as I was saying, it was only a small portion of the expert's opinion testimony that crossed the line from merely embracing the ultimate issue, and leaving an obvious inference for the jury to make, and to actually stating an opinion as to that ultimate issue. So the overwhelming evidence I was talking about starts with Mr. Turner's own testimony. He described in his testimony to the jury that he hid the guns that were charged in the indictment. When asked why, he said, well, my girlfriend who I live with, she doesn't allow the guns. When asked why, he said, well, she knows I'm not supposed to be around these guns. He went on to say that he knew he was not supposed to have any of it, and said that this contraband might, quote, destroy his relationship. These are statements of a person who understands the nature of their actions. He even explained in his recorded interview that was on the same day as his arrest, that he bought the guns from a guy on the street. Why? He was not allowed to buy them at the store because of his felony conviction. He acknowledged that because of that conviction, he was not allowed to possess guns at all. But counsel, wasn't it the case that he also indicated that he didn't want to tell his girlfriend anything about working with the officers that he thought he was working with? Because she had a child, and there were concerns that it would be difficult, and there would be problems. I mean, isn't that another way that a reasonable jury could have construed the evidence? It could have. And I think that those portions of his testimony only reinforce that he understood that sometimes it's all right to possess weapons, and other times it's not. Right. So if a reasonable jury drew the inference or understood from the testimony that the reason that he didn't tell, that the reason that he hid the guns from the girlfriend was because he did not want to tell her about his work with, or what he thought was his work with the detective and the agent, then how does that show guilty knowledge that he's not supposed to have the guns if he thinks that he's working with these agents? His burden on the insanity defense specifically would be to show that he was unable to appreciate the nature and quality of his actions, and that's different from showing that he specifically knew that it was against 922G for him to possess the guns. So I don't think that evidence cuts against the overwhelming evidence showing that he could not have made an insanity defense. And the court referenced the entrapment by estoppel defense, and that asks a different question. That asks whether a person in his position would have reasonably believed that they had authority to possess the gun. And so those aren't perfectly mutually exclusive, but I think it bears note that they're in tension with each other. For example, his testimony was that, I held off. I held off possessing those guns until I had express authorization. Now, if the jury had credited that testimony, it might have tended to show that he had met his burden on entrapment by estoppel. Turns out the jury did not credit that testimony. But simultaneously, that testimony showed again that he understood that sometimes it's okay to possess this gun, and other times it's not. But isn't it somewhat inextricably intertwined? I mean, the evidence on whether or not he had a mental defect, whether or not he understood the nature of what he was doing, isn't that somewhat intertwined with whether or not there was entrapment? If I understand the court's question, it's whether— As a factual matter. My understanding of the court's question is that perhaps he might have that trial, though he didn't, argue that as a symptom of the severe mental disease or defect that I had, I had maybe a hallucination that gave me reason to believe that I had authority to possess this gun. Is that the court's question? It's more—not exactly. I think the hallucination was—or the alleged hallucination was with respect to the shooting that occurred. I think that the question is whether he—in line with whether he understood that what he was doing was wrong, right, he—in other words, if he understood what he was doing was wrong, then it seems that he couldn't have been entrapped. But if he did not understand what he was doing was wrong because he thought that he had—not because of a hallucination, but perhaps because of a misunderstanding or a lack of sophistication on how these things work, or the fact that he had had 40 texts with officers or whatever the case might be, if he thought that he had authorization to purchase the guns as part of his duties as what he thought was being a CI, then wouldn't the testimony from Dr. Barnett be somewhat related to the determination of his entrapment defense? I don't think so, Your Honor, for a couple of reasons. So let's take, for example, a case—not this case—where there's abundant evidence that he had expressed authorization to go commit a crime. That would be a separate question from whether he understood the nature of his actions. So he could believe it's okay for me to possess this gun based on law enforcement authorization, but that testimony would defeat an insanity defense where he would have to show he didn't understand at all what the nature of his actions were. And another reason that that doesn't— But I guess my question is actually the opposite, right? The question is whether it would affect the entrapment defense as opposed to whether it would defeat the insanity defense. I don't think Dr. Barnett's testimony would necessarily defeat or show harmless error with respect to the entrapment defense in this case. And that's first because her testimony, the challenge testimony, was specific about his ability to discern right from wrong in that moment. And that, like I said, our position is that's separate from whether he reasonably believes that he had authorization from law enforcement. And another reason it doesn't contribute to harmless error in this case is that the basis for the expert's opinion was intuitive. It was something that a jury could easily understand. A person who can have a calm conversation with law enforcement and talk through the events of the day and understand the consequences of his actions as he told officers, am I going to federal prison or state prison because of the gun? That is all intuitive and easy for a jury to understand. So it's unlike a case where an expert's opinion might have been based on something esoteric or highly complicated, where their stamp of approval as an expert would then carry more weight. And it's also different from other cases where the evidence might have been equivocal as to a defendant's state of mind. So, I'm sorry, go ahead. Here, the evidence all pointed toward him understanding right from wrong at the time of the charged conduct. So, let me ask you this then. If this wasn't, if this wasn't so important, then it kind of raises the issue of, I guess the prosecutor sort of led off with this in her opening. And then we have a couple of mentions of it, which are sort of intertwined with the other facts about the officers and the confidential informant status. And then we have it again in the closing. And so it seems to have been woven through the entire trial. And it almost appears as though just by looking at how many times it's mentioned and the ways in which it's mentioned, that the prosecutor seemed to think that this was important to obtaining the conviction. And I think that perhaps she might have been right, or at least I'm left with some serious doubt about it. I wonder if you want to address that. Well, as defense counsel stated, Mr. Turner testified to some worrying symptoms of seeing and hearing things that were not there. And if the jury credited that account, that's indeed a serious symptom. And so it strikes me that the prosecutor would be rightly concerned about this issue. As to the prosecutor's statements, the jury was properly instructed that the statements of any of the attorneys didn't constitute evidence. And their ultimate verdict had to be based on the evidence. Except that the jury was not properly instructed about the evidence concerning Dr. Barnett's opinion. And usually we can at least point to that and say, well, the jury was instructed as to what the evidence was. We presume that juries understand and follow instructions, but we don't have that here. So this seems a little different from some of the other cases where you might have at least the jury instruction to fall back on. That's true. As to Dr. Barnett's testimony, and I want to be clear about what I'm conceding here, the testimony that was on page 115 to 116 of document 210-1. So the rest of the challenge statements I would defend as proper. And if the court would like, I can address that issue. But the reason why even absent a specific instruction about that improper testimony, even absent that instruction, it's harmless. In part, as I was saying, the rest of the expert's opinion testimony was admissible and left only a small but permissible inferential step for the jury to make. She said that certain facts suggested that he understood right from wrong. She said that there were facts that might tend to show that he understood right from wrong. And she went through those facts, some of which I've mentioned, including his testimony and his behavior at the recorded interview, including his statement that he knew he was not allowed to possess the gun. So given the very small inferential leap, an intuitive inferential leap that the jury had to make to reach the exact same conclusion, the one statement by the expert did not raise a concern that it substantially affected the jury's verdict. And that's the test here is whether it substantially affected the jury's verdict. So based on his testimony where he talked about knowing he wasn't allowed to possess firearms, his recorded interview that was made the same day as his arrest where he acknowledged not being allowed to possess firearms. His behavior at the arrest where he followed the officer's directions, his prior police interaction in the summer of 2018, in which he understood he could be arrested for possessing the gun he had on that occasion. The absence of any psychotic symptoms for the entire time while he was in custody. And moreover- Well, I'm sorry. When he was at Butner, wasn't he having hallucinations and speaking and having voices, hearing voices and things? Or maybe I misunderstood. The expert's testimony was that he did not experience any symptoms during that time. Did he say that, were there statements that there were other folks who worked at the hospital who said that he had been? I can't specifically dispute that off the top of my head, Your Honor. Even so, the expert's unchallenged testimony about his diagnosis amply explained that the best explanation for his symptoms was severe withdrawal from alcoholism. And so finally, I'd reiterate that it was Turner's burden to establish the elements of insanity. And against all of that evidence of Mr. Turner's state of mind at the time of the charged conduct, the jury heard almost nothing about that would establish his burden. Even if they credited his statements about seeing and hearing things that weren't there, Section 17 requires more. It's not enough to see something that's not there. He must also not understand the nature and quality of his acts. He admitted to possessing the guns at least the day before. He admitted to knowing he wasn't supposed to have them. And that was enough to defeat the insanity defense. Thank you, Mr. McDonald. Thank you. Mr. Hamley. Mr. Hamley, you have a, I think you have a problem here. On page 115 of document 201, that trial transcript. Do you have a trial transcript there? I do, Judge. Yeah, look at page 115. Yes, Judge. My point is that I'm going to read some testimony. You can follow me. Is that the prosecutor was asking the doctor an irrelevant question. Totally irrelevant, which had to do with shooting the gun. Shooting the gun was not relevant. Possessing the gun before he was shooting it at any time on that day. With what was relevant. Possessing it, not shooting. So the question, the prosecutor didn't understand that. Somehow the prosecutor thought shooting the gun was the critical question. So she said, in your expert opinion, was Mr. Turner able to appreciate the nature and quality of the wrong of his actions on November 8th? Well, then she clears that up. Answer. Are you talking about notwithstanding alcohol? Like if he had no alcohol at all? And then the prosecutor gets back and said, was he able to appreciate the nature and quality of his actions on November 8th? And then there was an objection. Answer. So you're saying, was he able to time to do? And she said, let's use the moment in time, the moment in time when Lieutenant Fulford shows up and his body cameras turned on. That moment in time, Mr. Turner's shooting up the apartment. She wants to know he understood that was wrong to shoot up the apartment. And she answers, yes. My opinion, he did understand what had happened. Referring to the shooting had taken place. Well, then on cross examination. Uh, your problem, it seems to me is. You start off with protecting himself, and that's not relevant. Protecting himself is not relevant in this case. Shooting. Then she think I think now, now the doctor is helping out the prosecutor and says, I think what I was answering that question, it was my understanding that he meant his wrongfulness of having the firearm and not being allowed to have one. So that was on recross exam. And that's the first time that a question was put to the to the doctor. And she's talking about having the possessing the firearm as a convicted felon. So it was as I repeat myself, shooting up the apartment has nothing to do with this case, other than they happen to possess a firearm. You agree? I mean, whether that was wrong, it was wrongful. She said he understood that was wrongful to shoot up the apartment. I believe she's she that's clarified at some point where he states that later during the evaluation, he looked back. All I'm saying is that is that the prosecutor's direct examination was off point. Prosecutor didn't understand what was going on in terms of lawfulness and kept talking about shooting. Judge, I would when you and then you and then your questions brought out possessing it when he couldn't have it. Yes, judge. And I think it goes to before the shooting. We've got three firearms here that were obtained and I guess what I'm saying is it didn't violate the rule or the order to ask him whether he knew he was doing something wrong by shooting up the apartment. Because that wasn't the issue in the case. No, it was the possession. And one of those firearms he was shooting or not. It he had to fire on all day long, so whether he was shooting it or not, that have anything to do with violating the law. No, I think what it comes down to is the pistol that he obtained from his mother's house that morning when he was clearly going through was in the throes of a psychotic break from the night before he dropped his wife off. He went to his mother's house and the whole time he's thought people are after him, including that morning. He thought someone followed him from his fiance's work, followed him to his mother's house. While he's in there, he's feeling that he's hearing things outside, looks outside, sees vehicles and people. These are the same people that are going to attack him the night before. And again, this is not a frankly sane person. He's not thinking linearly. He's not thinking rationally. But at that point, he thinks these people know that I'm working for the police and they are trying to kill me. He had called police the night before saying people were jumping with AK-47s from rooftop to rooftop. So at that moment, when he took possession of his mother's firearm, he took that with the mindset that he is in immediate danger, that imminent, immediate danger to protect himself. And under a condition like that, it's not really a duress defense because in reality, the factors weren't there. But that's not really what insanity says. Does he understand the wrongfulness of his actions? And the law certainly has some justification for someone, even if they're a felon, that if they believe that getting a firearm would be immediate protection, that the benefit of protecting his life outweighs the technical legality, then in that moment, he would feel he is justified. This is necessary to take this firearm and protect my life or else I'm going to be killed. Counsel, let me ask you, is this part of what you were objecting to when the government asks, now, Dr. Barnett, you've sat in this front row during the entirety of this trial, is that correct? She says, that's correct. The government asks, and have you also had an opportunity over the course of roughly the last year to consider Mr. Turner's case? And you've also had the opportunity to meet with him in person over the course of three months, is that correct? She says, yes, I was here in the courtroom and I did see he was there for three months, yes. Government asks, and you watched that video of Mr. Turner after he was arrested, is that correct? She says, I did, I did. And the government says, and you've heard all of the witness testimony throughout the course of the trial? And Dr. Barnett says, I have, most of it, yes. And the government asks, now, based on your personal observations as a medical professional, and based on watching the post-arrest video, and based on the time that you spent with Mr. Turner, do you believe in your professional opinion, based on your observations, that he was unable to appreciate the nature of his actions on November the 8th? And then there's a defense objection, I object precisely my argument, the court overrules it, and then the government asks the question again, and Dr. Barnett says, I believe there are some, you know, there's suggestion that he did, after his arrest, he was able to very clearly explain to officers what had happened, he was able to say that he knew, you know, what had taken place, he did clearly, yes. Is that the part that you're objecting to, as opposed to simply the part that, the part about whether he knew at the time that he was doing the shooting, that what he was doing was wrong? I believe I was objecting to her giving her opinion as to whether he knew what he was doing was wrong on or about November 8th. I mean, that's how the indictment was written, on or about November 8th. So the day of, the days immediately prior, and really the days after, I think the government said that there was no indication of any sort of psychosis afterwards, and Your Honor asked about going up to Butner. What happened is within a day or so of the arrest, he had an acute event again, went to Baldwin County, emergency room or something, where he believed, I believe the testimony was complaining about being bitten by a dog and shot. But I think my, I believe that my objection would have been towards her opinion on the ultimate issue of whether he understood the nature of equality and or wrongfulness. That's something the government keeps leaving out, the wrongfulness. It's not even the legality, but the wrongfulness of his actions. All right. Thank you, counsel. Thank you. Any more questions? All right. Thank you, counsel. Mr. Hemley, I see that you were court appointed. We thank you very much for your representation here today of Mr. Turner, and we appreciate your efforts in this case. And thank you also, Mr. MacDonald. Thank you. All right. Thank you.